# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| STEPHEN CRAIG BURNETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. CIV 12-158-RAW-SPS |
| | ) | |
| KATHY MILLER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This action is before the court on the defendants' second motion for summary judgment. The court has before it for consideration plaintiff's complaint (Dkt. 1), the defendants' second motion for summary judgment (Dkt. 180), plaintiff's response (Dkt. 184), the defendants' reply (Dkt. 188), and a special report prepared by the Special Report Coordinator for Davis Correctional Facility / Corrections Corporation of America (Dkt. 59) at the direction of the court and in accordance with *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978).

Plaintiff, an inmate in the custody of the Oklahoma Department of Corrections (DOC) who is incarcerated at James Crabtree Correctional Center in Helena, Oklahoma, brings this action under the authority of 42 U.S.C. § 1983, seeking compensatory damages, punitive damages, and declaratory relief for alleged constitutional violations during his incarceration at Davis Correctional Facility (DCF), a private prison located in Holdenville, Oklahoma. The defendants are Kathy Miller, R.N., DCF Health Services Administrator; Raymond Larimer, R.N., DCF Nurse and occasional Acting Health Services Administrator; Nancy Colpetzer, R.N., DCF Nurse; and Mark Reiheld, M.D., DCF Physician.

In Count I plaintiff alleges he was denied prompt and adequate medical care, in violation of the Eighth Amendment and state law. He claims in Count II that this alleged denial arose from intentional retaliation, in violation of the First Amendment. Finally, in

Count III he alleges he suffered extreme emotional distress because of the defendants' acts and omissions, in violation of the Eighth Amendment and state law.

Plaintiff alleges that on or about November 1, 2011, he began experiencing chest pain even after minor exertion. On November 5, 2011, he submitted a Request for Medical Services to the DCF Health Services Department, and the next day Defendant Nancy Colpetzer, R.N., administered an EKG. Colpetzer told plaintiff, "It looks okay," but plaintiff's chest was hurting at the time, so he replied, "I find that hard to believe." Plaintiff's blood pressure allegedly was high, and Colpetzer told him to return the next day to recheck his blood pressure. Plaintiff believes Colpetzer was not truthful with him, or she lacked sufficient training to interpret the EKG results.

Plaintiff's chest pain continued daily, and on November 12, 2011, he submitted a second Request for Medical Services, stating he was experiencing frequent chest pains and wanted to see a medical doctor. He believed he was in imminent danger of dying of a heart attack, but he received no response. He thought the staff with the DCF Health Services Department were ignoring him and would let him die. He allegedly suffered extreme emotional distress from his fear of dying, considering his father had died from a stroke at the age of 68.

Plaintiff's daily chest pains continued, and on November 21, 2011, and December 4, 2011, he submitted his third and fourth Requests for Medical Services, asking to see a doctor for his symptoms. Again, there allegedly were no responses.

On December 7, 2011, plaintiff was called to Health Services to see Defendant Dr. Mark Reiheld. The doctor administered another EKG and told plaintiff he needed to go to the hospital as soon as possible. Defendant Kathy Miller, R.N., the DCF Health Services Administrator was present. After Miller talked with Dr. Reiheld, plaintiff was told to return to his housing unit.

Approximately two hours later, plaintiff was called back to Health Services. In Nurse Miller's presence, Dr. Reiheld told plaintiff he would be sent to the hospital within a day and

a half, even if it were necessary to send him on an emergency basis. Plaintiff claims Defendant Miller obviously did not want to send him to the hospital, and she placed him in a medical holding cell in the Health Services area. He asserts the cell was unheated, and the outside temperature was below freezing. After more than 18 hours, plaintiff was transported to the Oklahoma Heart Hospital in Oklahoma City by Sgt. Cherry and Officer Joiner. He contends Defendant Miller intentionally delayed sending him to the hospital, despite the doctor's instructions. Again, plaintiff allegedly was in great fear of dying. During this time plaintiff remembered Nurse Miller's motive for the delay, which was his history of litigation against another DCF Health Services Administrator.

When plaintiff arrived at the hospital on December 8, 2011, a "chemical dye test," a chest X-ray, an EKG, and a treadmill stress test were performed. Because the stress test had induced severe chest pain, plaintiff was transferred to the hospital's emergency room, where he was administered nitroglycerin. He spent the night at the Heart Hospital and was transported to the University of Oklahoma Medical Center the next day.

Plaintiff was diagnosed with unstable angina. He was advised that there were clots in some of his coronary arteries, and stents were required. On December 12, 2011, three stents were inserted in plaintiff's heart. Plaintiff alleges that when a clot blocks a coronary artery, the heart muscle beyond the clot does not receive oxygen, and that portion of the heart muscle dies. He contends the damage is permanent, and his life expectancy is reduced.

Plaintiff was discharged from the Medical Center on December 13, 2011. His discharge papers listed several prescription medications, including Plavix. The doctors and nurses stressed the importance of taking these medications daily, especially the Plavix, to prevent the stents from becoming clogged.

One of the hospital physicians asked whether the DCF pharmacy could supply Plavix, but plaintiff did not know. The doctor also inquired why plaintiff had waited so long to seek medical attention for his chest pain. When plaintiff told the physician that he had filed four written Medical Requests before seeing a doctor, the hospital physician allegedly was

3

shocked. The hospital physician stated he would call Dr. Reiheld to discuss the importance of plaintiff's receiving the prescriptions, especially the Plavix. Plaintiff also was told at his discharge that the DCF physician would review and explain the chemical dye test, plaintiff's medication plan, any activity restrictions, a special diet plan, and a follow-up exam by a cardiologist.

When plaintiff returned to DCF later that day, however, Dr. Reiheld opened the envelope with hospital records, but would not allow plaintiff to see them. Regarding the medications, Dr. Reiheld allegedly said, "You will get what we give you." He then handed plaintiff a pill bottle containing about eight Plavix tablets and advised that plaintiff could pick up his Keep on Person (KOP) medications on December 16, 2011.

According to plaintiff, the stents were inserted through an incision in the femoral artery in his groin. The Medical Center staff instructed him to take care not to cause the incision to open and bleed. Plaintiff, however, immediately was sent back to his housing unit, where he had to climb up and down stairs, as well as into and out of his top bunk assignment, because no activity restrictions had been issued by Health Services.

On December 16, 2011, plaintiff went to pick up his KOP (Keep on Person) medication at Health Services. He received lisinopril, metoprolol, Plavix, nitrostate [sic], naproxen, a stool softener, an antacid, aspirin, an aspirin-free pain reliever, and Milk of Magnesia. When plaintiff subsequently received a copy of some of his medical records, he learned he also had been prescribed Lipitor, but Dr. Reiheld had substituted Pravachol. He did not receive the Pravachol until February 17, 2012, after his family members contacted DOC medical staff.

When plaintiff returned to DCF on December 13, 2011, he learned that two other inmates also had received heart stents in 2011. Both men had been prescribed Plavix, but neither received it. Both men nearly died when their stents failed, and both required additional stents. In addition, plaintiff learned that two other DCF inmates had reported "considerable pain" to facility officials in 2011, but they died either before treatment or

4

shortly after treatment began.

On December 17, 2011, plaintiff submitted a Request to Staff to Defendant Kathy Miller, asking why it took 32 days for him to see Dr. Reiheld when he was experiencing chest pains. Miller's response on December 22, 2011, stated "11/06/11 normal EKG. 12/07/11 abnormal EKG-evaluated by Dr."

On January 3, 2012, plaintiff submitted DOC Grievance No. 2012-1001-00004G to Defendant Miller, in accordance with DOC policy. The grievance stated that Ms. Miller had not answered plaintiff's question about why it took 32 days for him to see a doctor. Because plaintiff believed there was no valid reason for the delay, he concluded it was out of retaliation for his recent history of filing grievances and lawsuits against CCA prison officials. Plaintiff opined that if he had died, a jury trial in a pending federal lawsuit would have been prevented. Plaintiff further stated in the grievance that the deliberate indifference to his medical problems had resulted in a permanent loss of part of his heart and a marked decrease in his life expectancy. Plaintiff also challenged whether the November 6, 2011, EKG taken by the nurse actually was normal. He asserted the EKG should have been interpreted by a medical doctor. He also asked for commensurate financial compensation, but that request was returned unanswered as an unavailable remedy.

On January 16, 2012, plaintiff received the grievance response, which was signed by Raymond Larimer, R.N., Clinical Health Services Administrator, and by DCF Warden Tim Wilkinson. The response stated that Larimer had investigated plaintiff's complaint and reports and found that on December 28, 2011, Dr. Reiheld had made an appointment referral to OU cardiologists. The referral was approved the same day, and DCF was waiting for notification of the appointment.

On January 19, 2012, plaintiff submitted his grievance appeal to the DOC Chief Medical Officer, in accordance with the grievance policy, complaining about the grievance response and the fact that he still had not seen a post-surgical cardiologist. The response to the grievance appeal, dated February 22, 2012, was issued by Acting MSA Sammie Kenyon,

R.N., C.H.S.A. Kenyon stated that plaintiff's request to see a heart specialist was in process. A regional physician had approved the follow-up examination, but no appointment had yet been scheduled. She also reiterated that the grievance policy has no available remedy for commensurate financial compensation.

On February 18, 2012, plaintiff submitted a Request to Staff to Kathy Miller, asking why there was a delay from December 12, 2011, until February 17, 2012, in receiving his prescription for Pravachol. Miller's response, received on February 27, 2012, stated that Pravachol was an important part of plaintiff's treatment plan, but it was not an essential medication. In addition, plaintiff had received his medication that month.

On February 28, 2012, plaintiff submitted Grievance No. 2012-1001-00163-G concerning this issue. He asked to receive his prescribed medication in a timely manner and asked for verification that his request would be granted. The grievance was returned unanswered on March 1, 2012, because it must be written in blue or black ink. The grievance also must specify dates, places, personnel involved, and how the inmate has been affected. Plaintiff was granted an additional ten days to properly resubmit the grievance.

On March 2, 2012, plaintiff mailed his grievance appeal to the DOC Chief Medical Officer, stating his previous appeal had stated how he was affected. He did not receive prescribed medication from December 13, 2011, until February 17, 2012, after his major heart procedure. Plaintiff asserted it was obvious that he had been denied adequate medical care, the previous grievance response was pretextual, and the return form that was used was not authorized by the grievance policy. Plaintiff further complained that the warden had not signed the returned grievance, as required by the grievance policy.

Plaintiff alleges that on March 6, 2012, he was transported to Oklahoma City where he was examined by a medical doctor who was studying to be a cardiologist. A nurse checked his blood pressure and conducted an EKG. She told plaintiff that a doctor would have to give plaintiff the results, because a nurse would need specialized training in cardiology to interpret the test. Plaintiff contends the nurse's statement supports his claim

that DCF Nurse Colpetzer should not have concluded his November 6, 2011, EKG was normal without having the test interpreted by a doctor.

The doctor then told plaintiff that the EKG that day looked all right. Plaintiff inquired about the extent of his heart damage and the effect on his life expectancy, and the doctor told him an ultrasound would be needed to make such an assessment. Plaintiff's blood pressure was high, and he told the doctor he was more irritable and antisocial than before.

Plaintiff claims he continues to fear dying of a heart attack. Since the December 12, 2011, surgery, he has had less energy and requires more sleep. He contends he expects any future medical problems will be intentionally delayed, "in the hope that he will die and be replaced with a younger and healthier inmate at this private prison to make a profit," resulting in extreme emotional distress. On January 2, 2013, plaintiff advised the court that he had been transferred to a DOC facility. (Dkt. 56).

**Standard of Review**

The defendants have filed a motion for summary judgment (Dkt. 180). Having moved for summary judgment in their favor, the movants are required to show the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

Summary judgment is not appropriate if there exists a genuine material factual issue such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-51 (1986). Plaintiff, as "the nonmoving party may

7

not rest on [his] pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which [he] carries the burden of proof." *Applied Genetics Int'l. v. First Affiliated Sec., Inc.*, 912 F.2d 1238 (10th Cir. 1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). In this regard, all evidence of the nonmoving party is deemed true, and all reasonable inferences are drawn in favor of the nonmoving party. *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 114, 158-59 (1970)). "To defeat a motion for summary judgment, evidence . . . must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). This court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Adickes*, 398 U.S. at 249. With these standards in mind, the court turns to the merits of the defendants' motion.

**Count I: Medical Claims**

Plaintiff alleges he was subjected to an unconstitutional 32-day delay in receiving medical treatment. The record shows that plaintiff submitted a Request for Medical Services on Saturday, November 5, 2011, complaining of chest pain after even minor exertion. (Dkt. 180-2 at 2). He was seen by Defendant Nancy Colpetzer, R.N., in the prison medical clinic on Sunday, November 6, 2011. (Dkt. at 180-3 at 2-7, Medical Records, and 180-4 at 3-4, Affidavit of Nancy Colpetzer, R.N.). Nurse Colpetzer began a nursing assessment of plaintiff at 9:12 a.m. (Docket No. 180-3 at 2). Her assessment noted that plaintiff had no known drug, environmental, or food allergies. Nurse Colpetzer took a self-reported history from plaintiff. He stated his chest pain with light activity began two weeks earlier. The chest pain was intermittent/sharp, was accompanied with shortness of breath, was associated with light activity such as walking to the chow hall, and it resolved within a couple of minutes while resting. Colpetzer noted plaintiff's obesity as a risk factor and charted dyspnea (shortness of breath) as an associated symptom. She also charted plaintiff's respirations as even, his lungs as clear, his skin as pink and warm, his level of consciousness as

awake/alert/oriented, and his appearance as "no distress." Her charted assessment was that the alteration in plaintiff's comfort regarding his chest pain was cardiac, musculoskeletal, or pleuritic. She also noted that plaintiff was prescribed naproxen and took two tablets daily, and she obtained and charted plaintiff's blood pressure, respiration rate, pulse, and temperature. (Dkt. 180-3 at 2-3, 52). In his deposition, plaintiff did not dispute Nurse Colpetzer's observations and assessments. (Dkt. No 180-6 at 4-9, Deposition of Plaintiff).

Based upon Nurse Colpetzer's observations and examination, along with plaintiff's complaints, she determined that an EKG test was appropriate. (Dkt. 180-4 at 3). She connected plaintiff to the facility's EKG machine, an Atri-6100 automated medical device that uses a 12-lead system that alerts medical personnel if the system leads are not connected correctly to the patient. *Id.* She had been provided training regarding use of the machine and had used it routinely. *Id.* Similar machines are used in doctor's offices and hospitals throughout the United States. (Dkt. 180-8 at 2, Affidavit of Defendant Mark Reiheld, M.D.).

According to Nurse Colpetzer, the EKG machine uses a powerful interpretation algorithm and generates a printed tracing. (Dkt. 180-4 at 2). As part of the printout, the machine algorithm automatically generates a printed "normal" or "abnormal" statement. (Dkt. 180-4 at 3). The printed tracing of plaintiff's cardiac activity on November 6, 2011, indicated "Normal EKG" (Dkt. 180-3 at 4). Nurse Colpetzer did not interpret the EKG report, but she placed the EKG printed tracing in the facility physician's box for physician review. (Dkt. 180-3 at 5 and 180-4 at 4).

Based upon her observations, examination, and plaintiff's verbal reports to her, Nurse Colpetzer determined that he was not in an "emergent" situation. (Dkt. 180-4 at 4). She instructed plaintiff to return to the medical clinic in one week to have his blood pressure re-checked. (Dkt. 180-4 at 4). She also advised him to return to the clinic without delay, if his condition changed in the interim. *Id.* Plaintiff admits Nurse Colpetzer gave him a nurse's slip to return for a blood pressure re-check. *Id.*

Nurse Colpetzer recommended that plaintiff be scheduled to see the facility physician.

(Dkt. 180-4 at 4, 180-3 at 7). Without an emergent or emergency condition, however, a 30-day scheduling period to see the doctor is not uncommon. (Dkt. 180-4 at 4). She would have recommended an accelerated appointment scheduling, if warranted by plaintiff's observed condition. *Id.*

The facility's medical clinic sick call log for November 6, 2011, shows that Nurse Colpetzer indicated on the log the need to schedule plaintiff to see the facility physician. (Dkt. 180-3 at 7). According to DCF Health Services Administrator Ray Larimer, R.N., this meant she requested an appointment with the facility physician be scheduled for plaintiff. (Dkt. 180-7 at 3, Affidavit of Ray Larimer, R.N.).

On November 10, 2011, the facility physician Dr. Reiheld reviewed the November 6, 2011, EKG and determined that the results were normal. (Dkt. 180-3 at 6, EKG Tracing of 11/06/2011). If Dr. Reiheld had noted anything of concern, he would have had plaintiff brought to the clinic for a follow-up examination. (Dkt. 180-8 at 3).

As instructed, plaintiff returned to the facility medical clinic on Saturday, November 12, 2011, to re-check his blood pressure. Nurse Colpetzer charted that she met with him at 8:41 a.m. and obtained a blood pressure reading of 153/93. (Dkt. 180-3 at 8, 52). She also charted that plaintiff's blood pressure continued to be elevated, he still was reporting chest pain with activity, he denied chest pain while at rest, and he denied ever waking up with chest pain. (Dkt. 180-3 at 8). She charted that she planned to re-check his blood pressure the next day and would schedule an appointment with the facility physician, if his blood pressure remained elevated. *Id.* Plaintiff agrees with Nurse Colpetzer's report of his statements regarding not having chest pain while resting and not being awakened by chest pain. (Dkt. 180-6 at 12).

Although he was seen in the clinic on November 12, 2011, on that same day he submitted a written Request for Medical Services, asking to see a medical doctor about his frequent chest pains. (Dkt. 180-2 at 3). The Sick Call Log for November 14, 2011, indicates the request was received on that date, and an appointment with the doctor was scheduled for

10

November 22, 2011. (Dkt. 180-3 at 12).

Plaintiff returned to the clinic the next day on Sunday, November 13, 2011. *Id.* Nurse Colpetzer charted that she obtained plaintiff's blood pressure of 139/87, which was within normal reference ranges. (Dkt. 180-3 at 10, 52-53). She also charted that he continued to complain of chest pain with activity and had requested to see the physician. (Dkt. 180-3 at 10). She noted, "Plan to schedule for physician assessment." *Id.*

On Monday, November 21, 2011, plaintiff submitted a third Request for Medical Services. (Dkt. 180-2 at 4). He wrote, "I want to talk to a medical doctor ASAP. Any minor exertion causes chest pains. I am 62 years old." The medical clinic's sick call log for November 22, 2011, indicates that an appointment with the facility physician was scheduled for the same day. (Dkt. 180-3 at 13). Plaintiff's records, however, contain no progress note charting the results of an appointment on the date, and the defendants allege the absence of the progress note indicates he did not show up for the appointment. (Dkt. 180-7 at 3). Plaintiff contends the appointment was for a blood pressure check, not one to see the physician, and he never was a "no-show" for a doctor's appointment. (Dkt. 184 at 3-4).

Plaintiff submitted a fourth Request for Medical Services dated Sunday, December 4, 2011, writing, "I want to see the doctor. Even minor exertion causes me great chest pain. Walking from DS to the chow causes this every time." (Dkt. 180-2 at 5).

According to plaintiff's deposition, he was in the prison library on December 7, 2011, when one of the facility nurses came there and told him he had an appointment at the clinic. (Dkt. 180-6 at 30). According to the progress note prepared by Odessa McCorvey, R.N., plaintiff was seen in the facility medical clinic at 8:48 a.m. on that date. (Docket No. 180-3 at 14). Plaintiff reported, "Walking from Delta South to the Chow Hall causes chest pain & shortness of breath." *Id.* Nurse McCorvey charted plaintiff's weight as 280, his temperature at 97.7°, his pulse as 89, respirations at 20, and sitting blood pressure at 149/93. *Id.*

Comparing plaintiff's reported and assessed symptoms of December 7, 2011, to those from November 6, 12 and 13, there was no reported deterioration in his condition. He did not

11

report to Nurse McCorvey that he was awakened by chest pains or that the chest pain did not go away with rest. Plaintiff does not dispute Nurse McCorvey's charting. (Dkt. 180-6 at 32).

Nurse McCorvey obtained another EKG test on December 7, 2011. (Dkt. 180-3 at 14). The printed tracing of his cardiac activity indicated "Abnormal EKG." (Dkt. 180-3 at 15, EKG Tracing of 12/07/2011). McCorvey charted that she placed him on the appointment schedule for the facility physician. (Dkt. 180-3 at 14). Dr. Reiheld met with plaintiff at 3:30 p.m. that same afternoon at the facility medical clinic. (Dkt. 180-3 at 16-17). Dr. Reiheld charted the following: Chest pain x 3 weeks, dad with stroke at 68, height 73 inches, weight 278.0, temperature 97.2, pulse 82, respirations 20, blood pressure (sitting) 144/91, no previous history of heart problems or chest pain, borderline elevated BP on record with no B/P meds, started about three weeks ago and has reoccurred when any significant walking of 100 yards or if excitement. (Dkt. 180-3 at 16). Dr. Reiheld made a general assessment of "good," with a diagnosis of angina new onset. (Dkt. 180-3 at 17). The charted plan was to "schedule for imaging procedure asap" with a follow-up at 6 a.m. tomorrow. *Id.* Dr. Reiheld also charted that he discussed what was happening with plaintiff, and plaintiff verbalized his understanding. *Id.*

According to Dr. Reiheld, plaintiff's medical condition on December 7, 2011, was not emergent, and plaintiff was not in need of immediate transportation to an off-site facility. (Dkt. 180-9, Mark Reiheld, M.D.'s Responses to Interrogatories at 2-4 (actual 16-18), 9-11 (actual 23-25)). Plaintiff was housed in the medical clinic in an observation cell, so his situation could be monitored and so he would be readily accessible for transportation to off-site imaging tests. (Dkt. 180-8 at 4). Cathy Delonis, L.P.N., charted on December 8, 2011, that plaintiff stated he was doing fine in the observation cell and had no complaints of pain or distress. (Dkt. 180-3 at 18). A Monitoring Form dated December 9, 2011, states that plaintiff was asleep from midnight until 6:00 a.m., was lying or sitting from 6:30 a.m. until 8:00 a.m., then began movement to the off-site medical appointment. (Dkt. 180-3 at 19).

On the morning of December 9, 2011, plaintiff was transported to the Oklahoma Heart

12

Hospital (OHH) in Oklahoma City, Oklahoma, where a myocardial perfusion imaging test was performed that day. (Dkt. 180-3 at 20-23, Dkt. 180-5 at 5, Affidavit of Kathy Miller, R.N.). During the stress test plaintiff experienced fatigue and mild dyspnea, expected for the degree of stress, and chest discomfort that was relieved with nitroglycerin. (Dkt. 180-3 at 24). The test ended in accordance with the planned protocol, the results were discussed with plaintiff, his chest pain resolved, and his electro-cardiac changes improved. (Dkt. 180-3 at 22). Plaintiff, however, asserts he actually suffered a heart attack during the test. (Dkt. 184 at 4).

Plaintiff than was taken to the OHH emergency room to address his immediate symptoms. (Dkt. 180-3 at 22, Dkt. 180-5 at 6). His blood pressure was 165/107, his heart rate was normal without murmurs, click, gallops, or rubs, and his family history was determined to be non-contributory. (Dkt. 180-3 at 25). Another EKG was obtained, and it indicated normal sinus rhythms with some concerning ST depression. (Dkt. 180-3 at 26). His CBC laboratory results were unremarkable, his heart rate was stable, and he was pain-free. *Id.*

The OHH physicians requested that plaintiff be transferred to the University of Oklahoma Medical Center for treatment, but there were no available beds there. (Dkt. 180-3 at 24, Dkt. 180-5 at 6). He, therefore, was admitted to the OHH on December 9, 2011, for monitoring over the weekend. (Dkt. 180-5 at 6).

Plaintiff was transferred from OHH to the OU Medical Center on December 12, 2011, where a left heart catherization was performed and three stents were placed--one in the poximal to mid-left anterior descending coronary artery, one in the mid to distal left anterior descending coronary artery, and one in the proximal ramus intermedius. (Dkt. 180-3 at 34-35). The attending physicians' reported impressions were: "(1) Coronary artery disease . . . with intermediate right coronary artery disease; (2) Successful stenting of the proximal and mid left anterior descending coronary artery with two drug-eluting stents; and (3) Successful stenting of the ramus intermedius with drug-eluting stent. (Dkt. 180-3 at 35). The physicians recommended aspirin be given indefinitely and that Effient or Plavix be administered for a minimum of one year. *Id.*

Plaintiff was discharged from the OU Medical Center on December 13, 2011. (Dkt. 180-3 at 36). He signed the discharge instructions and was returned to Davis Correctional Facility where he met with Defendant Ray Larimer, R.N. (Dkt. Dkt. 180-3 at 37-41).

Plaintiff received the medications recommended by the cardiac specialists. On December 13, 2011, he received eight Plavix pills directly from Dr. Reiheld. (Dkt. 180-6 at 33-34). Plaintiff admits he received Plavix for one year following the stent procedure. (Dkt. 180-6 at 35). Dr. Reiheld also prescribed aspirin, naproxen, Tylenol, Lisinopril, Lipitor, Nitrostat, Colace, Lopressor, and Milk of Magnesia, all of which were obtained and provided to plaintiff. (Dkt. 180-3 at 42-50, Dkt. 180-6 at 37-40, Dkt. 180-7 at 4). Lipitor, however, no longer was carried at the pharmacy, so Dr. Reiheld substituted Pravachol. (Dkt. 180-7 at 5). Defendant Larimer states by affidavit that Pravachol is a statin drug like Lipitor, and that while it was important to plaintiff's overall treatment plan, it was not immediately an essential medication. *Id.* On December 16, 2011, plaintiff was provided a 30-day supply of his KOP prescriptions. (Dkt. 180-5 at 7). Plaintiff began receiving Pravochol on February 17, 2012. (180-5 at 8; 180-7 at 5).

Plaintiff returned to the OU cardiac care physician for a follow-up on March 6, 2012. (Dkt. 180-3 at 51). Plaintiff self-reported to OU physicians that he was doing well after placement of the stents, had no angina or chest pain, had not used the prescribed nitroglycerin at all, and was received all prescribed medications. *Id.* The OU physicians recommended that plaintiff's LDL cholesterol be brought closed to a target level of 70, and his Pravochol prescription was continued. (Dkt. 180-3 at 51, Dkt. 180-7 at 5). His LDL cholesterol had been charted as 111 in December 2011, and it had dropped to 78 in November 2012. *Id.*

**Analysis**

> [D]eliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of

14

action under §1983.

*Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (citations and footnotes omitted).

Deliberate indifference involves both an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A prisoner first must produce objective evidence that the deprivation at issue was in fact "sufficiently serious." *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996) (internal quotation marks omitted). The subjective component is met if a prison official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

With this standard in mind the court is of the view that the acts complained of do not show deliberate indifference to plaintiff's medical needs as alleged. "Certainly, not every twinge of pain suffered as the result of delay in medical care is actionable." *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000). "Delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference which results in substantial harm." *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993) (quoting *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)).

It is clear from the record that medical care was provided. Where there is such evidence of a "series of sick calls, examinations, diagnoses, and medication . . . it cannot be said there was a 'deliberate indifference' to the prisoner's complaints." *Smart v. Villar*, 547 F.2d 112, 114 (10th Cir. 1976). Plaintiff was transferred to an outside medical facility for additional testing when there was an abnormal EKG result, and he then was sent to another outside facility for surgery. After his surgery, he was examined by an outside cardiac physician, and he received his necessary prescriptions. To the extent he is complaining about

15

the inadequacy of medical care provided, the court finds plaintiff is merely asserting a difference of opinion as to the kind and quality of medical treatment necessary under the circumstances. It is well settled that this type of disagreement fails to give rise to a cause of action under § 1983. *See McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977), *cert. denied*, 435 U.S. 917 (1978), and cases cited therein.

Regarding plaintiff's claim that he suffered emotional distress in violation of the Eighth Amendment, "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . ." 42 U.S.C. § 1997e(e). While claims for mental and emotional distress can be brought pursuant to § 1983, § 1997e(e) provides that "such a suit cannot stand unless the plaintiff has suffered a physical injury in addition to mental or emotional harms." *Perkins v. Kansas Dep't of Corrections*, 165 F.3d 803, 807 (10th Cir. 1999) (quotations omitted). Plaintiff cannot make this showing.

Plaintiff's claim of a conspiracy to deprive him of medical treatment also fails. "[A] deprivation of a constitutional right is essential to proceed under a § 1983 conspiracy claim." *Snell v. Tunnell*, 920 F.2d 673, 701-02 (10th Cir. 1990). Thus, to prevail on such a claim, "a plaintiff must plead and prove not only a conspiracy, but also an actual deprivation of rights . . . ." *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir. 1990) (citations omitted).

After careful review, the court finds there is no genuine issue of material fact in this action, and summary judgment should be granted. The court further finds the allegations in plaintiff's complaint are vague, conclusory, and speculative, and the allegations do not rise to the level of a constitutional violation. The Tenth Circuit Court of Appeals consistently has held that bald conclusions, unsupported by allegations of fact, are legally insufficient, and pleadings containing only such conclusory language may be summarily dismissed or stricken without a hearing. *Dunn v. White*, 880 F.2d 1188, 1197 (10th Cir. 1989), *cert. denied*, 493 U.S. 1059 (1990); *Lorraine v. United States*, 444 F.2d 1 (10th Cir. 1971).

The preceding analysis disposes of all of plaintiff's claims arising under federal law, and, consequently, the basis for federal subject matter jurisdiction. "Under these circumstances, the district court may decline to exercise continuing 'pendent' or supplemental jurisdiction over plaintiff's state claims." *Lancaster Independent Sch. Dist. No. 5*, 149 F.3d 1228, 1236 (10th Cir. 1998) (citing 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs*, 383 U.S. 715, 725-26 (1966)). The court, therefore, declines jurisdiction over plaintiff's state law claims for negligence, medical malpractice, and intentional infliction of emotional distress.

**ACCORDINGLY,** the defendants' second motion for summary judgement (Dkt. 180) is GRANTED, and this action is, in all respects, DISMISSED as frivolous and malicious. This dismissal shall count as a STRIKE, pursuant to 28 U.S.C. § 1915(g). All remaining pending motions are DENIED as moot.

**IT IS SO ORDERED** this 25ᵗʰ day of August 2014.

**RONALD A. WHITE**
**UNITED STATES DISTRICT JUDGE**